PER CURIAM.
The Director of the Office of Lawyers Professional Responsibility filed a petition for disciplinary action against respondent Tracy R. Eichhorn-Hicks. After an evidentiary hearing, the referee concluded that Eichhorn-Hicks committed professional misconduct by (1) not stating in a written fee agreement that the fee could be subject to a refund; (2) failing to communicate a plea agreement to a client; and (3) signing his client's name on a medical-records release form, falsely signing as a witness to his client's signature, and then presenting the signed release to a third party. The referee recommended that we suspend Eichhorn-Hicks for a minimum of 60 days, require Eichhorn-Hicks to petition for reinstatement under Rule 18(a)-(d), Rules on Lawyers Professional Responsibility (RLPR), and place Eichhorn-Hicks on probation for 1 year if he is reinstated.
Eichhorn-Hicks challenges the referee's findings and conclusions concerning the communication of the plea agreement and the medical-records release form, and he argues that he should not have to petition for reinstatement. The Director urges us to adopt the referee's recommendations as to discipline.
We hold that the referee did not clearly err when he found that Eichhorn-Hicks (1) had failed to communicate a plea agreement to a client, in violation of Minn. R. Prof. Conduct 1.1, 1.2(a), 1.3, and 1.4(a)(1)-(3); and (2) that Eichhorn-Hicks signed his client's name on a medical-records release form, falsely claimed to have witnessed the client's signature, and then presented the *35 signed release to a third party, in violation of Minn. R. Prof. Conduct 8.4(c)-(d). We further hold that, based on the circumstances of this case, the appropriate discipline is an indefinite suspension with no right to petition for reinstatement for 120 days.
FACTS
Respondent Tracy R. Eichhorn-Hicks was admitted to practice law on September 26, 1975, and has practiced predominantly criminal law for most of his career. Eichhorn-Hicks has been disciplined on eight prior occasions for similar, but unrelated, misconduct. He has received four admonitions-in 1994, 2004, and twice in 2005-for violating rules related to trust accounts, diligence, and communication with clients. He has also been placed on private probation twice; publicly reprimanded and placed on probation once, see In re Eichhorn-Hicks (Eichhorn-Hicks I ), 767 N.W.2d 20, 21 (Minn. 2009) (order); and suspended from the practice of law for 1 year for violating rules related to trust accounts, temporarily misappropriating funds, and committing other misconduct involving false certification and false statements, see In re Eichhorn-Hicks (Eichhorn-Hicks II ), 615 N.W.2d 356, 357 (Minn. 2000) (order).
This disciplinary action concerns professional misconduct that occurred in three client matters between 2014 and 2016. We summarize the referee's findings of fact and conclusions of law below.
A.
F.F.-V. was charged with two felonies related to the sale and possession of controlled substances.[1] F.F.-V. fired his first attorney over a fee dispute. Eichhorn-Hicks agreed to represent F.F.-V. for a flat fee of $10,000. The written retainer agreement did not include an explanation that the flat fee was subject to a refund under certain circumstances. The referee concluded that this omission violated Minn. R. Prof. Conduct 1.5(b).[2] Eichhorn-Hicks does not dispute the referee's factual findings or conclusions of law with respect to the fee agreement.[3]
B.
Eichhorn-Hicks represented C.S.-A. in a criminal case. C.S.-A. is a native of Ghana and became a lawful permanent resident of the United States in 2006. He is married to another lawful permanent resident and has four children, three of whom are United States citizens. C.S.-A. was the chief executive officer of a home health care services company that received *36 reimbursements from the Minnesota Department of Human Services.
In June 2013, C.S.-A. was charged with four felony counts of medical-assistance fraud for submitting false reimbursement claims. While represented by previous counsel, C.S.-A. accepted the prosecution's offer to plead guilty to two counts of theft to "limit the immigration consequences." At the plea hearing, C.S.-A.'s previous counsel and the court questioned C.S.-A. extensively about the potential immigration consequences of a guilty plea. C.S.-A. expressed his understanding that there were no guarantees regarding immigration consequences.
After pleading guilty in 2014, C.S.-A. retained Eichhorn-Hicks, seeking to withdraw his plea. At a hearing that followed, the court set aside C.S.-A.'s guilty plea and remarked that the plea was "perhaps too generous" and that the court would not consider the deal again.
C.S.-A. e-mailed Eichhorn-Hicks that he was still interested in a plea agreement because of the emotional and financial toll of the case. C.S.-A. wanted a deal with no jail time, restitution of $18,000, and that did not "affect [his] immigration status." The prosecution offered a plea requiring C.S.-A. to plead guilty to one count of theft in exchange for a sentence of 60 days of jail time (stayed), 2 years of probation, and restitution of $9,999. The prosecution e-mailed and mailed a written offer of that plea to Eichhorn-Hicks.
Eichhorn-Hicks admitted never providing the written plea offer to C.S.-A. C.S.-A. claimed that Eichhorn-Hicks never told him about this plea offer. He testified that he did not learn of the offer until he picked up a copy of his case file after Eichhorn-Hicks's representation was over. C.S.-A. testified that he was "shocked" that Eichhorn-Hicks failed to advise him of the prosecution's offer and that he would have taken the offer.
In response to C.S.-A.'s complaint, Eichhorn-Hicks told the Director that he had discussed the plea offer with C.S.-A. but did not specifically identify a date when this occurred. Eichhorn-Hicks explained that C.S.-A. was "not interested in entering into a plea negotiation" and "wished definitely to go to trial." C.S.-A., however, e-mailed Eichhorn-Hicks that any plea offer would need to include "nothing on [his] records because of [his] other businesses" and "[n]o publication of [his] case to any site." C.S.-A. asked Eichhorn-Hicks to negotiate with the prosecution regarding "the deal," which referred to the original deal that C.S.-A. had accepted. C.S.-A. testified that he was interested in a plea because of the stress on his family and the fact that his wife was pregnant.
C.S.-A. eventually was convicted of three counts of medical-assistance fraud. He filed a petition for postconviction relief. On review, the district court found that there was "no reasonable probability" that C.S.-A. or the court would have accepted the new plea offer. The court of appeals affirmed, and we denied further review. An immigration court also ordered C.S.-A. deported from the United States.
Although the referee found that Eichhorn-Hicks did not provide or communicate the plea offer to C.S.-A., the referee also found that C.S.-A.'s claim about accepting the new plea offer was speculative because of the "absolute conditions relating to his immigration."
The referee concluded that Eichhorn-Hicks's failure to communicate the plea offer violated Minn. R. Prof. Conduct 1.1,[4] 1.2(a),[5] 1.3,[6] and 1.4(a)(1)-(3).[7]
*37 C.
Eichhorn-Hicks represented D.V. in a criminal case. While incarcerated, D.V. was dissatisfied with the medical care that he was receiving and asked Eichhorn-Hicks to obtain his medical records. Eichhorn-Hicks wrote to jail personnel seeking a copy of his client's medical records. Personnel told Eichhorn-Hicks to submit a medical-records release form signed by D.V. Eichhorn-Hicks signed D.V.'s name on a medical-records release form, and then he signed his own name as a witness to D.V.'s signature. Eichhorn-Hicks gave the signed release to jail personnel. But the jail did not release the medical records after comparing the purported signature of D.V. on the form to one on file and finding that the signatures did not match.
Although Eichhorn-Hicks did not dispute that he signed D.V.'s signature on the medical-records release form and that he signed his own name as a witness to D.V.'s signature, he testified that he signed the release as attorney-in-fact under a power of attorney. The referee found that Eichhorn-Hicks was named only as successor attorney-in-fact on D.V.'s executed power of attorney. Eichhorn-Hicks did not tell the jail that he signed D.V.'s name nor did he note that he was signing as attorney-in-fact on the release. The referee found that this conduct was misleading and violated Minn. R. Prof. Conduct 8.4(c)-(d).[8]
ANALYSIS
I.
Eichhorn-Hicks challenges the referee's findings of fact and conclusions of law regarding the C.S.-A. and D.V. matters. The referee's findings of fact and conclusions of law are not conclusive because Eichhorn-Hicks ordered a transcript of the disciplinary hearing. See Rule 14(e), RLPR ; In re Greenman , 860 N.W.2d 368, 371 (Minn. 2015). But we give the referee's findings of fact and conclusions of law "great deference" and will uphold them when "they have evidentiary support in the record and are not clearly erroneous." In re MacDonald , 906 N.W.2d 238, 243-44 (Minn. 2018), cert. denied , No. 17-1457, --- U.S. ----, 138 S.Ct. 2681, --- L.Ed.2d ----, 2018 WL 1912290 (June 25, 2018). We address each client matter individually.
A.
Eichhorn-Hicks contends that the referee's finding that he failed to communicate the plea offer to C.S.-A. is clearly erroneous because C.S.-A.'s story changed *38 too many times for it to be believable.[9] C.S.-A. testified that he never received the plea offer, and the referee found that he did not receive that offer. "We defer to a referee's findings on such matters as credibility." In re Walsh , 872 N.W.2d 741, 749 (Minn. 2015) (citation omitted) (internal quotation marks omitted). Because there is evidentiary support for the referee's finding and the uncorroborated statements of Eichhorn-Hicks are the only evidence supporting his argument that the plea agreement was communicated to C.S.-A., this finding is not clearly erroneous.
B.
Eichhorn-Hicks challenges the referee's findings and conclusions concerning D.V.'s matter. He does not dispute that he signed D.V.'s name on the medical-records release form and that he signed his own name as a witness to his client's signature. He essentially asserts a no-harm-no-foul defense and attacks the referee's conclusion that his failure to write "attorney-in-fact" on the medical-records release form violated Minnesota law regarding a power of attorney. See Minn. Stat. § 523.23, subd. 1 (2016) (when acting for the principal, requiring an attorney-in-fact to disclose his or her identity as an attorney-in-fact by signing in a specific manner).
His arguments, however, miss the mark. The referee did not conclude that Eichhorn-Hicks committed misconduct because he failed to follow statutory requirements for a person acting as attorney-in-fact. Rather, the referee found that Eichhorn-Hicks acted in a misleading manner by signing D.V.'s name on the medical-records release form without informing jail personnel that he had done so and then falsely signing his own name as a witness to D.V.'s signature. Moreover, there is no executed power of attorney that names Eichhorn-Hicks as the attorney-in-fact for D.V. Even if we credit his claim that he was signing as an attorney-in-fact, Eichhorn-Hicks did not prove that he had the legal authority to do so.
We have previously held that signing a client's name to a medical-records release form and obtaining the records thereby is a violation of Minn. R. Prof. Conduct 8.4(c) and (d). See In re Arbeiter , 764 N.W.2d 814, 814-15 (Minn. 2009) (order). Unlike in Arbeiter , Eichhorn-Hicks did not actually obtain the medical records because jail personnel refused to honor the request after comparing the signature on the medical-records release form to that of D.V.'s. See id. That jail personnel discovered Eichhorn-Hicks's dishonest conduct does not excuse the wrongfulness of Eichhorn-Hicks's decision to falsely sign his client's name and his name as a witness on a medical-records release form and then present that release form to a third party. The referee's findings of fact and conclusions of law are not clearly erroneous.
II.
We next turn to the question of what discipline is appropriate. "Although *39 we give great weight to the referee's recommendation, we maintain the ultimate responsibility for determining the appropriate sanction." See Greenman , 860 N.W.2d at 376 (citation omitted) (internal quotation marks omitted). "The purpose of attorney discipline ... is not to punish the attorney, but rather to protect the public [and] the judicial system, and to deter future misconduct by the disciplined attorney as well as by other attorneys." In re Fairbairn , 802 N.W.2d 734, 742 (Minn. 2011) (citation omitted) (internal quotation marks omitted).
In determining the appropriate discipline, "we consider four factors: (1) the nature of the misconduct; (2) the cumulative weight of the disciplinary violations; (3) the harm to the public; and (4) the harm to the legal profession." In re Nelson , 733 N.W.2d 458, 463 (Minn. 2007). We also consider aggravating and mitigating circumstances and the discipline imposed in similar cases. See In re Tigue , 900 N.W.2d 424, 431 (Minn. 2017). Although we "look[ ] to similar cases for guidance on the appropriate discipline, we tailor the discipline to the specific facts of each case." Greenman , 860 N.W.2d at 376.
A.
We first consider the nature of Eichhorn-Hicks's misconduct. The serious misconduct here included the failure to communicate a settlement offer to a client, the false signing as a witness to and misrepresenting the authenticity of a medical-records release form, and the failure to provide a written fee agreement with a flat-fee refund clause. These instances of misconduct are both serious and clear violations of the rules.
B.
We next consider the cumulative weight of Eichhorn-Hicks's misconduct. "[T]he cumulative weight and severity of multiple disciplinary rule violations may compel severe discipline even when a single act standing alone would not have warranted such discipline." Nelson , 733 N.W.2d at 464 (citation omitted). "We distinguish between a brief lapse in judgment or a single, isolated incident and multiple instances of misconduct occurring over a substantial amount of time." In re Taplin , 837 N.W.2d 306, 312 (Minn. 2013) (citation omitted) (internal quotation marks omitted).
The rules violations here arise from three different client matters occurring over the course of approximately 2 years. Eichhorn-Hicks, therefore, committed "multiple instances of misconduct ... over a substantial amount of time." Id.
C.
We also consider the harm to the public and to the profession resulting from the misconduct of Eichhorn-Hicks. "Misconduct involving dishonesty is particularly serious because honesty and integrity are among the most important attributes the public has the right to expect of lawyers." In re Glasser , 831 N.W.2d 644, 648 (Minn. 2013). Thus, the misrepresentations of Eichhorn-Hicks regarding D.V.'s medical-records release form "harmed both the public and the profession by undermining the public's confidence in the honesty and integrity of lawyers." Id.
The failure to communicate a settlement or plea offer to a client "reflect[s] adversely on the bar[ ] and [is] destructive of public confidence in the legal profession." See In re Shaughnessy , 467 N.W.2d 620, 621 (Minn. 1991). The failure of Eichhorn-Hicks to communicate a plea offer to his client, therefore, also harmed the public and the profession.
*40 D.
We next consider any aggravating or mitigating factors. Although there are no mitigating factors here,[10] the referee found several aggravating factors. First, the referee noted Eichhorn-Hicks's experience in the practice of law, specifically criminal law. Substantial experience is an aggravating factor. Cf. In re Rebeau , 787 N.W.2d 168, 176 (Minn. 2010) (citing In re Overboe , 745 N.W.2d 852, 867 (Minn. 2008) ). All of the rules violations here arose from criminal matters. Eichhorn-Hicks has been practicing law for more than 40 years. His experience is an aggravating factor.
Second, the referee found that Eichhorn-Hicks has failed to recognize the misconduct, admit wrongdoing, or express remorse for any of the rules violations, save for the Rule 1.5(b) violation. See In re Rooney , 709 N.W.2d 263, 271 n.4 (Minn. 2006) ; In re Kaszynski , 620 N.W.2d 708, 712 (Minn. 2001) (recognizing lack of remorse as an aggravating factor). Lack of remorse is an aggravating factor here.
Third, the referee noted that Eichhorn-Hicks has an extensive history of discipline. See In re Cutting , 671 N.W.2d 173, 175 (Minn. 2003) ("[P]revious misconduct of the same type is considered an aggravating factor when determining the appropriate discipline."). We expect attorneys to show a "renewed commitment" to ethical behavior "after being disciplined." Tigue , 900 N.W.2d at 432 (citation omitted) (internal quotation marks omitted). When the prior discipline is for similar misconduct, that history "weighs heavily" on the determination of discipline. Id. Eichhorn-Hicks has been disciplined eight times, including for violations of Rule 8.4(c) and (d) for false certifications on his attorney-registration statements and false statements to the Director, Eichhorn-Hicks II , 615 N.W.2d at 357, and violations of Rule 1.5(b) for failure to provide written fee agreements when accepting advance fees, Eichhorn-Hicks I , 767 N.W.2d at 20. Eichhorn-Hicks's history of discipline is an aggravating factor.
E.
We "look to similar cases to ensure that the discipline imposed is consistent." Tigue , 900 N.W.2d at 431. Ultimately, though, we impose discipline on a case-by-case basis. Walsh , 872 N.W.2d at 749. When attorneys misrepresent the authenticity or propriety of signed documents, we often impose lengthy periods of suspension. See In re Aitken , 787 N.W.2d 152, 162 (Minn. 2010) (collecting cases). Similarly, the failure to communicate settlement or plea offers often warrants a lengthy suspension. See In re Ulanowski , 800 N.W.2d 785, 797, 804 (Minn. 2011) (suspending an attorney for 1 year for failure to communicate a plea offer, among other violations); De Rycke , 707 N.W.2d at 374, 376 (disbarring attorney after failure to communicate a plea offer, among other violations); In re Grzybek , 567 N.W.2d 259, 263, 265 (Minn. 1997) (same).
The referee recommended a 60-day suspension and a requirement that Eichhorn-Hicks petition for reinstatement under Rule 18(a)-(d), RLPR. Eichhorn-Hicks argues that he should not be required to petition for reinstatement. When an attorney is suspended for less than 90 days, it is *41 only under exceptional circumstances that the attorney is required to petition for reinstatement. See Rule 18(f), RLPR (stating that "[u]nless otherwise ordered by this Court," a petition for reinstatement is not required when a lawyer has "been suspended for a fixed period of 90 days or less"). Eichhorn-Hicks argues that this is not one of those exceptional cases.
But we need not decide this issue. In light of the misconduct here and the aggravating factors present, including that this is the ninth time that Eichhorn-Hicks has been disciplined and that he has previously been disciplined for similar misconduct, we conclude that a 60-day suspension will not adequately protect the public or the judicial system, or deter future misconduct. Instead, based on the specific circumstances of this case, we hold that a 120-day suspension is appropriate.
Accordingly, we order that:
1. Respondent Tracy R. Eichhorn-Hicks is indefinitely suspended from the practice of law, effective 14 days from the date of this opinion, with no right to petition for reinstatement for 120 days.
2. Respondent shall comply with the requirements of Rule 26, RLPR (requiring notice of suspension to clients, opposing counsel, and tribunals), and shall pay $900 in costs under Rule 24(a), RLPR.
3. Respondent may petition for reinstatement under Rule 18(a)-(d), RLPR. Reinstatement is conditioned on successful completion of the written examination required for admission to the practice of law by the State Board of Law Examiners on the subject of professional responsibility and satisfaction of continuing legal education requirements. See Rule 18(e)-(f), RLPR.
4. If respondent is reinstated, respondent will be placed on probation for at least 1 year, and the conditions of respondent's probation will include the following:
(a) Respondent shall cooperate fully with the Director's Office in its efforts to monitor compliance with probation. Respondent shall promptly respond to the Director's correspondence by the due date. Respondent shall provide the Director with a current mailing address and shall immediately notify the Director of any change of address. Respondent shall cooperate with the Director's investigation of any allegations of unprofessional conduct that may come to the Director's attention. Upon the Director's request, respondent shall provide authorization for release of information and documentation to verify compliance with the terms of probation.
(b) Respondent shall abide by the Minnesota Rules of Professional Conduct.
Suspended.

The referee found that F.F.-V.'s criminal charges were for felony drug possession. The Director contends, correctly, that this finding is clearly erroneous. The criminal complaint shows that F.F.-V. was charged with felony first-degree sale of a controlled substance and felony second-degree possession of a controlled substance.

Minnesota Rule of Professional Conduct 1.5(b) allows lawyers to charge flat fees for their services but requires a written fee agreement signed by the client that notifies the client of the right to a refund for all or a portion of the fee if the specific legal services are not performed.

The referee also found that Eichhorn-Hicks failed to adequately communicate with F. F.-V. about his case, in violation of Minn. R. Prof. Conduct 1.4(a)(3), (b), even though the petition did not allege a violation of those rules. "As a matter of due process, [an attorney] cannot be found to have violated disciplinary rules by certain actions which were not the subject of formal charges." In re Graham , 453 N.W.2d 313, 316 n.1 (Minn. 1990). The parties contend, and we agree, that we should not consider the referee's findings of fact and conclusions of law regarding the unalleged violations.

"A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." Minn. R. Prof. Conduct 1.1.

"A lawyer shall abide by a client's decision whether to settle a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered." Minn. R. Prof. Conduct 1.2(a).

"A lawyer shall act with reasonable diligence and promptness in representing a client." Minn. R. Prof. Conduct 1.3.

Minnesota Rule of Professional Conduct 1.4(a)(1)-(3) requires lawyers to "promptly inform the client of any decision or circumstance [requiring] the client's informed consent, ... reasonably consult with the client about the means by which the client's objectives are to be accomplished[, and] keep the client reasonably informed about the status of the matter."

"It is professional misconduct for a lawyer to ... engage in conduct involving dishonesty, fraud, deceit, or misrepresentation," Minn. R. Prof. Conduct 8.4(c), or to "engage in conduct that is prejudicial to the administration of justice," Minn. R. Prof. Conduct 8.4(d).

The referee concluded that Eichhorn-Hicks's failure to communicate the plea offer violated Minn. R. Prof. Conduct 1.1, 1.2(a), 1.3, and 1.4(a)(1)-(3). In his brief to this court, Eichhorn-Hicks argued in a single sentence that the failure to communicate a plea offer "is a violation of only [Minn. R. Prof. Conduct.] 1.4." Summary arguments made without analysis or citation to legal authorities are forfeited. See In re Karasov , 805 N.W.2d 255, 271 n.12 (Minn. 2011) (concluding that arguments were "waived" when there was no "cit[ation] to applicable law" or "analysis of the law"). Eichhorn-Hicks's conclusory argument also is contrary to our case law. See In re De Rycke , 707 N.W.2d 370, 374 (Minn. 2006) (concluding that a clear violation of Minn. R. Prof. Conduct 1.3 and 1.4 occurred when an attorney did not inform a client of a plea offer).

Eichhorn-Hicks contends that the referee found that there was a lack of harm to his clients and listed that finding as part of the aggravating and mitigating factors. The Director contends that a lack of harm to clients cannot be considered a mitigating factor. The Director is correct. As we made clear in Tigue , "although any harm to [a lawyer's] clients is a relevant consideration when determining the appropriate discipline, lack of harm to clients is not a separate mitigating factor." 900 N.W.2d at 433.